## No. 6570.

### Mrs. Mary L. Hardin vs. Wolf & Cerf.

The holder of a mortgage, given by a wife with her husband's authority, on her separate property, *without* the authorization of the judge under the act of 1855, must prove that the debt which the mortgage was given to secure inured to the wife's separate benefit, before he can hold her liable.

A wife separated in property is liable for her proportion of the household expenses, and for the whole of such expenses, if her husband is without means.

The homestead law embodies, in part, the public policy of the State, and rights acquired under it can not be waived by any convention of parties.

APPEAL from the Sixth Judicial District Court, parish of St. Helena.· *Kemp, J.*

*H. M. Carter*, for plaintiff and appellant.

*J. M. Wright*, for defendants.

The opinion of the court was delivered by

EGAN, J. This action is against a married woman separated in property from her husband. It is based upon a promissory note and mortgage executed by her, *with* the authorization of her husband, but *without* that of the judge, and upon a small balance of account with

plaintiffs' merchants at Osyka, Mississippi. The defendant pleaded the want of authority to contract the debt, or to execute the note and mortgage, denied that she purchased the goods, etc., as alleged by plaintiffs, or that she authorized their purchase, and specially denied that the articles named in the account of plaintiffs, or the consideration of the note and mortgage, inured to her separate benefit. The mortgage was by public act, and contains the usual pacts, and also an express waiver of all claim of homestead exemption under any existing or future laws of the State.

The first question to which our attention is invited by the answer and the brief of defendant's counsel is the effect of section 3981, 3 R. S., and arts. 126 and 127, R. C. C., which are but a re-enactment of the act of 1855, "to enable married women to contract debts and bind their dotal and paraphernal property with the authorization of their husbands and of the judge, and upon the certificate of authorization of the latter." This is not an open question. In the case of Rice vs. Alexander, 15 An. 54, it was held " that the law, as it stood, in regard to the contracts of married women, previous to the act of 1855 referred to, remains unchanged, except that a married woman taking the benefit of that act is placed on the footing of *a femme sole*, and her contract, made with the judge's authorization under the statute, is sufficient, or, in the language of the act, "full proof" against her, while under the general jurisprudence those who deal with a married woman are bound to see and prove that the contract made with her inures to her benefit. The authority to execute the note and mortgage in the case at bar was given by the husband, *who signed both* with the wife for that purpose. It remains, then, to inquire whether the plaintiffs have shown sufficiently the liability of the wife defendant by evidence outside of the note and mortgage. The husband is deaf and dumb, and without property or means of support of himself or family, the wife is separate in property from him, and owns the only property in the family, consisting of a tract of land upon which they reside, and which, in the years 1873–74, was cultivated by two sons of the family for the common benefit and support. Early in 1873 the defendant, Mrs. Hardin, gave plaintiffs a mortgage upon her land to secure them for advances of supplies, etc., to be made for the use of the plantation and family.

The evidence shows that these supplies were furnished accordingly, and that subsequently the mortgage and note now sued on were given *with* the husband's authorization, in lieu of the original mortgage, which was given by the wife alone, without the husband's authorization, and to cure that defect. The wife, whose testimony was taken in the case, admits signing the mortgage, and that she signed it supposing it might assist her sons in cultivating the crop; that the family were supported

by the farm; that she relied on the revenues arising from the crops for support, and that no member of the family owned or possessed any lands or real estate. It is further shown that she subsequently acknowledged the indebtedness when the account was shown her, and begged indulgence when plaintiffs threatened to foreclose the mortgage. It is quite likely that the plaintiffs took advantage of the necessities of the family, and also took into account the risk, and charged exorbitant prices. The defense was not, however, based upon this ground, nor does the evidence enable us to determine it, much as we would feel disposed to do so. It is shown, however, that the defendant was separate in property, was the sole property owner, that the credit was given to her, and articles for the use of the family and plantation furnished upon the faith of that credit, and that her husband had nothing and no means of support. R. C. C., article 2435, provides "that the wife who has obtained the separation of property must contribute in proportion to her fortune and to that of her husband both to the household expenses and to those of the education of their children." And again : "She is bound to support those expenses alone if there remains nothing to her husband; and even when the husband has property, if all that of the wife be paraphernal and she has reserved to herself the administration of it, she ought to bear a proportion of the marriage charges equal, if need be, to one-half her income." R. C. C. 2389. She may, also, with the authorization of her husband, bind herself as surety for any other person than her husband. 2 An. 903 ; 5 An. 369 ; 14 An. 15. Her separate property is also liable for her frauds without reference to the question of authorization. 2 An. 1 ; 6 An. 56 ; 10 An. 433. Under this principle, having induced the credit, she would be bound, and her separate property liable. It is also immaterial whether, according to plaintiffs' theory and evidence, the consideration inured to her own advantage and that of her separate property, whether, according to her theory or statement, the mortgage was given to assist her sons, or whether the debt was contracted for the support and maintenance of the family, she being the sole property owner, as we have seen.

The only remaining question is as to the right and power to waive the homestead exemption, as was done in this case. The determination of this question is the more important, because, homestead exemptions being comparatively recent in Louisiana, there has been no adjudication by this court on the subject. In other States it has been often considered, and the adjudications have been by no means uniform, while in most it is regulated by statute. In a majority of the States, however, it is held that such waiver is ineffectual and will not be enforced. See Smyth on Homestead and Exemptions, section 542, citing 15 Cal. 266 ; 22 N. Y. 249 ; 9 How. Prac. R. 547 ; 10 How. Prac. Rep. 282 ; 9 Am. Law Reg. (La.) 112 ;

1 Am. Law Reg. (N. S.) 553 ; 16 Iowa 415 ; 20 Iowa 376 ; 16 Iowa 243 ; 7 Wis. 582 ; 20 Pick. 90 ; 2 Cald. (Tenn.) 283.   In Pennsylvania, where the right of waiver seems not to have been questioned before, in the case of Forrester vs. Mack, 49 Penn. (13 Wright) 387, decided in 1865, the court says: "If, with the experience and observation we have had, we were now to pass upon the question for the first time we would be very likely to deny the right of waiver altogether, and stick to the statute as it is written." In Crawford vs. Lockwood, 9 How. Prac. R. 547, the court refused to enforce a waiver of "the benefit of all and every exemption of property from sale on execution under the laws of the State." In Harper vs. Leal, 10 How. Prac. R. 276, the debtor made a promissory note, and for the payment of the same agreed "to waive all exemption to property," and the court said : "Not only am I of opinion that the agreement in this note to waive all exemption to property creates no estoppel, but I go further, and hold that it must also be regarded in the eye of the law as a hard, oppressive, and unconscionable contract, and that it is totally void, as in contravention of the spirit of our statutes and of public policy." In Kruette vs. Newcomb, 31 Barb. 169, the same principle was affirmed.   The note on which the judgment in that case was recovered expressly waived and relinquished "all right of exemption of any property I may have from execution on this debt."   The judges all concurred that a person contracting a debt can not agree with the creditor that in case of non-payment he shall be entitled to levy his execution upon property exempt from levy by the general laws of the State. In Curtis vs. O'Brien, 20 Iowa, 376, the same doctrine was maintained, and such an agreement was held contrary to public policy.   The same author before referred to, Smyth on Homestead and Exemptions, the latest and fullest work on the subject which we have seen, published in 1875, after a large experience of exemption laws in most of the States, and upon a review of all the authorities, says with much force (section 545): "The statutes which allow exemption are based upon views of public policy, intended for the preservation of families *against the improvidence* or misfortune of the head, and the latter can not, by any executory agreement, waive such exemption; because if effect were given to such waiver a few words contained in any note or obligation *would operate to change the law* between debtor and creditor, and if they were enforcible, such words would generally by inserted in obligations for small demands, and so frustrate the intention of the Legislature."

That such was the object of the homestead exemption under the laws of Louisiana, and that it was not intended for the benefit of the debtor, but for the protection and benefit of the family, is apparent from the provision requiring not only that the property be occupied as a residence and *bona fide* owned by the debtor, but that he shall have a family, or

mother or father, or person or persons dependent upon him for support. C. P. 645. As has been said before, we have nothing to do with the policy or impolicy of the law. As was said in the Pennsylvania cause, *ita lex scripta est*, and the judicial department of government is bound by it. To permit the waiver of the exemption, would be to revise the policy of the law at the option of the debtor, for whose personal benefit it was evidently not designed, and we are unable to perceive why it should not be considered immoral and against the interests of society to permit one who has given a mortgage to claim the benefit of the exemption from its operation, and that it should be so considered where he had simply, in an executory agreement, added the words of waiver. In our opinion one act is as immoral as the other, and neither rests on that ground, but on the policy of the law-maker. Arguments on that subject apply equally to the operation and effect of usury laws which enable the debtor not only to refuse to pay the excessive interest, but to recover it back within a year, and also to all statutes creating exemptions which violate the doctrine of common pledge equally with that now under consideration. The same may be said of all bankrupt and insolvency laws which provide for the release of the debtor from his obligations without payment in full.

The rich and prosperous condition of Louisiana before the war, when every one was independent, as a rule, and the contrary an exception rendered homestead exemptions unnecessary. No sooner had the war ended, however, than, owing to the prostrate and impoverished condition of the people, both here and in several of our sister States of the South, the protection of the debtor's family against absolute beggary through his fault or misfortune began to be guarded against by the passage of homestead exemption laws. Ours was immediately and earnestly pressed to its passage at the extra session of the Legislature in the fall of 1865, thus evincing the public policy and demand. The exemption then made has continued through every successive change of legislation and government, and may now be considered with us, as it has long been with other States, and especially with the great and growing West and the Pacific slope, as part of our settled policy. As to whether this policy be good or bad, wise or unwise, about which there are and have always been, and always will be, conflicting opinions, it is not our province to determine. It is enough that we find it so, and it, therefore, becomes us to deal with it by the light of the experience and observation, the wisdom and the jurisprudence of other States where similar laws have been of longer existence and of more extended operation. In the new West, as in our sister State of Texas (see 14 Texas Rep. 449), this policy of homestead exemption has been largely influenced by a desire to invite new population of men of families and small

22

means, to develop their resources and build up the country with the fresh scope given to their industry and enterprise from the assurance that under all circumstances the shelter for their families was secured to them against disaster or misfortune in business. And where would the same motive find more appropriate place than in Louisiana, where the influx of a new and hardy yeomanry would prove a panacea for all troubles, political and material.

There is another view to take of this question of waiver of homestead exemption. In several of the States, as in Connecticut and Alabama, for instance, the levy on exempt property is considered the same as a levy on a third person's property, and the officer who makes such seizure is liable for a trespass. See Smyth, section 547, citing 16 Conn. 144, and several cases from Alabama and Pennsylvania. In Louisiana a highly penal statute to the same effect was passed in 1874, p. 53, and again in 1876, p. 123, while nowhere is the penalty of nullity more fully denounced against all acts and contracts in contravention of public policy, R. C. C. 1893 and 1895; and by an express provision of our law (C. C., art. 12), whatever is done in violation of a prohibitory law is void, though its nullity be not formally directed.

For the reasons stated, it is therefore ordered, adjudged, and decreed that the judgment of the court below be avoided and reversed so far as it recognizes and seeks to enforce the waiver of exemption of the homestead of the defendant, which is hereby decreed exempt as such from seizure or sale under plaintiffs' mortgage and judgment, and that in all other respects it be affirmed. It is further ordered that plaintiffs pay the costs of appeal and defendant the costs of the court below.

CONCURRING OPINION.

MARR, J. The exemption of property from the pursuit of creditors is by no means a new feature in the law of Louisiana. The Civil Code of 1825, article 1987, exempted the right of personal servitude, of use and habitation, of usufruct to the estate of a minor child, the income of dotal property, money due for the salary of an office, and wages, or compensation for personal services.

The Code of Practice, article 644, exempted the linen and clothes, and the beds of the debtor and his family, his arms and military accoutrements, and the tools and instruments necessary for the exercise of the trade or profession by which he gains a living.

The act of 1843 exempted, in addition, corn, fodder, hay, provisions, and the supplies necessary for carrying on the plantation to which they are attached for the current year.

In 1852, by act No. 255, the widow and children left in necessitous cir-

·cumstances were entitled to be paid in preference to all other creditors, except the vendor, as much as one thousand dollars out of the effects of the succession; and in the same year, by act No. 324, the lot or piece of ground and buildings thereon occupied as a residence and *bona fide* owned by the debtor having a family were exempted to the value of one thousand dollars; also, necessary housekeeping effects to the value of two hundred and fifty dollars, the books of the family library, family portraits and pictures, and the books, instruments, and apparatus of the trade or profession of the debtor.

Then came the act of 1865, which exempted one hundred and sixty ·acres of ground and the buildings and improvements thereon, occupied as a residence and *bona fide* owned by the debtor having a family, or mother, or father, or person or persons dependent on him for support; also, one work-horse, one wagon or cart, one yoke of oxen, two cows and calves, twenty-five head of hogs, or one thousand pounds of bacon or equivalent in pork, and, if a farmer, the necessary quantity of corn and fodder for the current year, not to exceed two thousand dollars in value.

This was followed by the exemption of household and kitchen furniture, not exceeding six hundred dollars in value, sewing machines, and pianos.   1872, 1874, 1876.

Similar exemptions are to be found in the statutes of most if not all of the other States, and in the laws of the United States.   The act of Congress which authorizes collectors of internal revenue to enforce the payment of taxes by distraint and sale of the property of delinquents without judicial process (Revised Statutes, section 3187) and the bankrupt act (Revised Statutes, section 5045) make liberal exemptions in favor of the debtor who is the head of a family, and the latter act exempts such additional property as may be exempt by the laws and constitution of ·the State in which the debtor has his domicile as existing in the year 1872.

The universality of these laws, and the steady enlargement of the exemptions in our own State, have closed the question as to their expediency, if that could be the subject, legitimately, of judicial inquiry; and these laws are not to be regarded with disfavor nor construed otherwise than as remedial statutes, the plain manifestations of a well-settled public policy.

The homestead act of 1865 exempts from seizure and sale under execution the property of the debtor having a family, etc., dependent on *him* for support, occupied as a residence, etc.   It would be a narrow and strained limitation of this act to limit it to *men* alone, and to exclude from its benefits a *woman*, wife of a deaf mute, an imbecile, who can give her no assistance in providing for his wants and necessities and those of their offspring.   The law looks to the head of the family, to the

person who is the debtor, and upon whom rests the burden of maintaining the family; and its terms are broad enough to include that person, whether husband, or wife, or widow, or a man or woman never married.

The right of the debtor to claim this exemption is in no manner impaired by the granting of a mortgage, and it is difficult to perceive the advantage, in a moral point of view, in favor of the mortgagor who has not, over the mortgager who has, waived the exemption. In either case the exemption would deprive the mortgagee of the security given by a solemn contract, a formal hypothecation; and in neither case would the creditor have parted with his money, or given the credit, if he had believed that it was in the power of the debtor to deprive him of this security by any plea or claim.

It has been objected that this exemption ties up and keeps out of commerce a large amount of property. But this is a question of mere expediency, falling within the exclusive domain of the legislative department, and it can not be dealt with by the judiciary. Besides, as the debtor who has not granted a mortgage and the mortgager who has not waived have the unquestionable right to insist upon this exemption, the amount of property in commerce will not be materially increased by refusing the exemption in the comparatively few cases in which the most needy, the smallest proprietors, might be forced by the pressure of their necessities to agree in advance not to claim the benefit of the law.

The mortgager who claims the benefit of this exemption cheats the hopes and expectations of his creditor as effectually where he has not waived as where he has waived; because it is merely idle to suppose that a creditor would take or rely upon a mortgage which he knew at the time the law would not permit him to enforce. He who contracts a debt binds himself legally and morally to pay that debt. If he grants a mortgage to secure it he merely superadds the special engagement that the property mortgaged shall be applied to the payment of that debt by preference; and when he interposes a plea or a claim by which this hypothecation is defeated he violates his moral and legal obligation as completely, and inflicts precisely the same injury upon his creditor when he has not as when he has agreed formally and in advance that he will not interpose that plea or claim. The man who grants a mortgage contracts the solemn obligation that the property shall, in case of default on his part, be seized and sold in satisfaction of the debt intended to be secured; and he contracts no additional moral or legal obligation by formally stipulating that he will not do that which the mere giving of the mortgage necessarily implies that he will not do, prevent in any way the realization of the benefits which his contract professedly secures.

If we should decide that the debtor who has waived may not claim, while the debtor who has not waived may claim, the benefits of the

Mrs. Mary L. Hardin vs. Wolf & Cerf.

homestead exemption, we would virtually declare that it is in the power of the citizen to abrogate by his conventions the laws enacted in view of the public interest and public policy. The homestead exemption is not designed for the benefit of the debtor; it has in view his helpless dependents, and it intends to afford them a home and a shelter, and the means of living, of which it will not permit them to be deprived by his folly or his misfortune.

Our law-makers have not seen fit to make the homestead inalienable, nor would it be wise to attempt to do this. It may be to the interest of the family to abandon the domicile and seek a home elsewhere, and no law ought to or can impose any restriction upon this right. The power to sell for a price freely agreed upon is very different from the power to consent in advance to a forced sale. The mortgagee usually leaves a wide margin between the value of the property and the debt to be secured, and he may force a sale for cash at a most unpropitious time at two-thirds of the appraised value.

The debtor who waives the benefit of this exemption in advance occupies no worse position, morally, than if he should agree at the time of contracting a debt that he would not protect himself against its enforcement by a subsequent discharge under the bankrupt or insolvent laws. He who is driven by his necessities to mortgage the home of his wife and his children, by the mere act of granting a mortgage instead of selling the property, manifests the wish to retain it, and the hope that he may be able to save it by paying the debt. Under the pressure of his wants, deluded by his hopes and expectations, he consents to terms which he would never think of submitting to under other circumstances, and puts it in the power of the creditor to deprive him of the property for a price far below that which he might have obtained by voluntary sale. If he may, by the stipulations of the mortgage, subject to seizure and sale the property legally declared to be exempt, the whole object and policy of the law will be defeated, and the needy and helpless, the very persons designed to be protected, will be deprived of the benefits intended specially for them.

Every one who takes a mortgage understands that it is subject to the exemptions of the homestead act; and every one is held to contract with reference to the law. The exemption is absolute. Nothing in the act indicates the intention of the Legislature to make it dependent on the will of the debtor, and while the law may not deprive the citizen of the right to sell at his pleasure that which is his, it may well refuse to countenance, by giving effect to engagements in violation of its policy and prohibitions. An individual may renounce what the law has established in his favor alone, but he can not renounce that which is intended for the benefit of others and for the public good. R. C. C., articles 11, 12.

Homeless, helpless paupers are a curse to society, and the homestead act and other exemption laws are designed to protect the public as far as possible against this grievous burden. If it is once understood that the property which the law declares to be exempt can not be sold under legal process, whether with or without a previous contract and waiver, all pecuniary engagements will be made with reference to that exemption, and credit will rest upon a more secure, because a better defined, basis. We readily accept and adapt ourselves to settled and uniform rules of property; and it is not the exemption itself, it is the uncertainty as to its meaning and extent, that impairs confidence and injures credit. Let it be understood that the exemption is absolute, and no creditor will trust to or rely upon the exempted property, or estimate it in making his contracts and engagements.

I concur in the opinion and decree pronounced by Mr. Justice Egan, but the importance of the subject warrants the separate expression of my views of the law.

### DISSENTING OPINION.

MANNING, C. J.   The enactment of homestead laws has been frequent of late years. The arguments in their support are specious, and attract to them popular favor. Whatever may be the reasons that induce the Legislature to enact them, our sole duty is to ascertain what is the legislative will, and when ascertained to give effect to it.

All statutes which take property out of commerce and attempt to impress upon it the character of inalienability, and all statutes which are in derogation of common right, are to be strictly construed. The general law regulating the relations of debtor and creditor is, that the property of the debtor is the common pledge of his creditors. Laws which exempt any portion of the debtor's property from the pursuit of the creditor are exceptions to the general rule, and can not be extended by implication. Thus, it has been held by this court that predial property alone and not urban is exempt to the value of two thousand dollars under the statute of 1865.   Crilly's case, 25 An. 219; Hargrove vs. Flournoy, 26 An. 645.

The decisions in our sister States upon many questions arising under their homestead laws are conflicting. This is due in part to differences in the laws, and in part to the animus which pervades the judicial construction of them. An attempt has recently been made (Smyth on Homesteads) to systematize this branch of modern law, and the writer points out with accuracy. the dissonant characteristics of the laws in the States, showing the variant rules that have been adopted.

We have recently held that a mortgage, executed by a debtor upon

the only land he owned, which in quantity and value was less than that exempted by our statute, could not be enforced. Van Wickle vs. Landry, 29 An. 330. In that case we were strongly pressed to restrict the operation of the law to the time when the land is occupied as a homestead, and my brother Spencer approved that limitation and qualification of the debtor's right of exemption, and dissented from the opinion of the court. There was certainly ample room for difference of opinion on that question, and the same writer, to whose works allusion was just now made, informs us that that view still obtains in a few of the States, though the more recent view, he says (Smyth, sections 239, 240), is that expressed by a majority of the court in that case. In rendering the opinion of the court I disclosed a mental oscillation that was personal to myself upon the point involved, which was finally determined by the influence of the principle of *stare decisis*. But we are asked to go still further now. Then we held that the debtor could not be presumed to waive his legal right. Now we are required to disregard his express waiver. I can not assent to that doctrine.

The chief ground and the only tenable one on which that doctrine can rest here is the assumed public policy of the law, for there is no expression in our statute that warrants, or I would rather say compels, that construction. Now, if it be a distinct feature of public policy as shadowed forth in our homestead law that the family should be protected from the improvidence or misfortune of its head, why is this protection so partial and distinctive in its nature that it will not apply to those who live in towns, and whose families might be supposed to need the protection and to deserve the beneficence of the Legislature as well as the rural inhabitants.

May it not be true that judicial construction has enlarged the scope of these exemption laws ? It has been held that a widow, who became a debtor *durante viduitate*, was entitled to the benefit of our homestead law (Calvit vs. Hoy, Opinion Book 43, p. 358), and I think upon good grounds, all the other requisites concurring. But it has never been held until the present case that a married woman was entitled to it, although the law of this State makes her an object of its peculiar care. The statute does indeed specify that no debtor shall be entitled to the exemption provided for in it whose wife shall own in her own right and be in the actual enjoyment of property worth more than one thousand dollars. R. S. 1870, section 1691. Does this mean, or are we to infer from it, that the wife shall be entitled to the exemption provided the husband owns nothing ? The language does not bear that construction. That meaning, to my apprehension, is not even latent in it, certainly not patent upon it. And yet it is an admitted rule of construction that statutes like this can not be enlarged by implication.

There is great force in the argument that when a person performs the deliberate act of executing a mortgage to secure a debt, that act shall be held to be a tacit but perfect waiver of all right of exemption provided by law. It has been already observed that we refused to adopt that rule; but when the debtor not only executes the mortgage, but expressly and solemnly declares that he renounces all benefits of the exemption laws, and this declaration is recited in the act, I do not think he should be permitted afterward to gainsay it under any circumstances. I do not think the law comes to his relief and says " I will help you to speak untruthfully as well as to act dishonestly, and will interpose my shield between you and him who trusted first to your honesty to pay your debt, and next to your veracity that you would not evade it under cover of a special law."

There is much to be said also in favor of that public policy which is a conspicuous feature of the laws of all countries, and which is the basis of public morals, viz.: that compulsory fidelity in the discharge of money obligations elevates the character of the citizen, and by consequence promotes the public virtue. The State that visits by the penalty of its laws the violation or disregard of pecuniary engagements with the greatest rigor is the State that has the highest standard of public honor. Wherever the law offers a premium to dishonesty by providing means of escape to the citizen from the payment of his debts, whether the mode be by exemption of property from seizure or by the equally convenient one of hiding it under cover of another's claim, there will be found the greatest laxity of the public conscience and the most shameless disreregard of public and private obligations.

When, therefore, there is not an express statute conferring upon the party seeking to evade an obligation the unquestioned legal right to escape the consequences of that obligation, and he seeks to justify it upon the ground of public policy as the *motif* of the construction he invokes, it may not be improperly answered that the same considerations forbid the multiplication of those devices by which he who promises is excused from performing and he who renounces a benefit is permitted to enjoy it in spite of his renunciation.

SPENCER, J. I concur in the opinion of Mr. Chief Justice Manning.